We will take the cases up in the order in which they appear on the docket. I note that we have two cases submitted on the briefs and record today. Lopez v. Garland and Blanco v. Garland are submitted. So we'll start with Hocevar v. Kijakazi. And I'm pronouncing that wrong, probably, so if someone can correct me. Mr. Hopla. Kijakazi. John Hopla for the plaintiff. Michael Hocevar, III. If I might reserve two minutes for rebuttal at the end. Thank you, Your Honor. Yes, please watch your clock. Also, can you make yourself a little louder? Speak louder. Okay. That's good. And are we proceeding with argument? Yes, we are proceeding with argument. Usually we don't have everybody on the screen, though. Usually we just have the three judges and the two people who are arguing. Everybody looks really small. Can we fix this, Kwame? One moment, Judge. Let me see what's going on. Okay. Thank you. There we go. All right. Mr. Hopla, you may proceed. Thank you, Your Honor. This is a case of Michael Hocevar, and he has alleged an inability to work, and his application for SSI benefits filed in 2015 due to off-task behavior, largely an absenteeism, which is verified by the psychometric testing performed by Dr. Taubenfeld and other doctors in the record, as well as the psychological testing performed by Dr. Albord. The reasons that the ALJ gave for rejecting Dr. Albord, Dr. Taubenfeld, and the plaintiff himself are lacking. They're clearly an error not supported by substantial evidence. I think this case really comes down to, for me, was it a specific and legitimate reason for the ALJ to reject Dr. Taubenfeld based on an MSC, a mental status exam, from PA from December 2016 on a medication review, or even the successful performance of serial sevens, the identification of three objects after five minutes, and the spelling of world backwards and forward as he did in the examination with Dr. Albord. And my argument is this, that the multiple-hour, ten-component psychometric testing performed by Dr. Taubenfeld deserves greater weight, specifically since his examinations were consistent with the other psychometric testing performed earlier in the record. The rejection of Dr. Albord and for the rejection of plaintiff himself are not as concerning to me. I do believe that it's not clear and convincing to run through the regulation factors 16.3p and merely list how these factors are evaluated. I don't think that meets a clear and convincing standard. And I think the factors that he did evaluate didn't demonstrate that clear and convincing reasons to reject claimants. So, Mr. Hapala, the district court seemingly agreed with you on that, but just concluded that the ALJ's rejection of Dr. Albord's opinion showed that any error as to Dr. Taubenfeld was harmless. So, how do you respond? And I understand this is de novo review, but that is exactly why I brought this case up, specifically the court's reliance upon Molina to reject that. And I touched on this, but when we're looking at comparing Dr. Albord and Dr. Taubenfeld, there are two separate evaluations. One was a neurocognitive evaluation and the other one was a psychological evaluation. And the only neurocognitive components that were evaluated by Dr. Albord were the serial sevens, the spelling of the word world backwards and forward, and remembering three objects after five minutes. And my argument is that that simply is not a specific and legitimate reason supported by substantial evidence to reject a three-and-a-half-hour comprehensive psychometric evaluation that relied upon ten separate tests. So I'm asking the court to weigh the weight that the ALJ gave to the evaluation by Albord compared to Dr. Taubenfeld and whether or not Dr. Albord even evaluated the same things that Dr. Taubenfeld did. Mr. Hossevar lives with his son, but does anybody else live in the house with them? My understanding is that since 2002, 2003, since his head injury, he lived with his parents. It looked like his father may have been divorced and remarried, and his mother died in her 80s and his father died in his 90s. And since, I believe, 2017, he's lived in the home after his father's death. I saw some reference in the record to living with a grandmother. Does he also live with a grandmother? I believe that that may have been his father's remarriage because I know that his mother did die. At least that was mentioned in one of the evaluations.  So it seems that this ALJ really relied heavily on the inconsistency with the level of daily activities. And a reading between the lines that it appeared to me that ALJ viewed heavily was that he seemed to have sole responsibility as a caregiver. Can you hear me all right? I'm sorry. My earbuds keep falling out, and I can hear you fine. Thank you. Okay. All right. Sole responsibility for caregiving for his 12-year-old son. That seemed to be something that weighed heavily in the ALJ, even when he was rejecting the treating physician experts. And I know that his son was 12 years old by the time his father died, so I know that during the early developmental years of his child, he had assistance from his parents, or at least his father and whoever this grandmother was. I also see the ALJ relying very heavily on the fact that he drove to the hearing. And I can speak to where he lives in Glide, Oregon, and it is 80 miles away from the hearings office. And there's not a tremendous amount of traffic. It's a straight shot on the interstate. And I know that elsewhere in the record he discusses relying on his parents for transportation, and the ALJ did inquire at hearing about whether or not he drove his son to school, and he mentioned that he drove his son to school on a daily basis. Now, there's a question of whether or not driving a car at all is inconsistent with Dr. Taubenfeld's assessment that this man lacked the emotional stamina to perform essential job functions and the attention sufficient to perform these functions. Well, he's able to pay attention to drive safely to the hearing. And I guess my question, if that's going to be our criteria, you appeared at the hearing, therefore there's no way you can be disabled. I just don't think that's a standard we can go to and still find people disabled. What about—oh, sorry. Go ahead. Just on the emotional stamina front, it seems to me that raising an 11-year-old child would require a lot of emotional stamina. Why isn't that evidence that Taubenfeld's recommendation is inconsistent? I guess we don't have any evidence of how successful he is raising that child at all. We don't know how dependent he was on his parents to raise that child during the more difficult developmental years. And I note in the CDI investigation that they did report that the child was rather unruly on the porch and his father did pick him up. Picking his child up might be inconsistent with allegations of not being able to lift more than 10 pounds, but he didn't allege that. How well was he— Because Taubenfeld also found that he was a very loving and caring father to his 11-year-old son. So at least from an emotional standpoint, it seems that there's not evidence in the record for that. I don't know how the WACE, the WJI, the WMS, the CARS, the MCMI, measure emotional capacity to sustain activity. I think it's one thing to have an emotional feeling towards your child of love and care and concern, and another thing to have the emotional sophistication to endure an eight-hour workday or interact appropriately with co-workers, supervisors, and the public. That's true, but it would be substantial evidence to support the ALJ's finding, though. To have a child? Well, to say that Dr. Taubenfeld's finding that he lacks emotional stamina is contradicted by objective evidence, which includes his very loving support of his child. Yes, I would suggest that it's Dr. Taubenfeld. He said he lacked the emotional stamina to perform essential job functions. He is able to take his child to school. There is mention of going to school meetings. There is mention of meeting with teachers. So to the extent that he's able to do those things, if that's inconsistent with Taubenfeld's conclusion, then I concur whether or not he's able to maintain the attention and concentration sufficient to get through an eight-hour day. I don't know. I don't have the psychiatric background to even understand how these 10 psychometric tests led him to those conclusions other than reading his evaluation. This is a question that sometimes I see in the social security cases. Is his condition deteriorating? It seems as though, I mean my reading of this, and I'm not a psychiatrist or medical examiner at all, but it seems like it's deteriorating. Would he be able to reapply for benefits? If the ALJ, say we were to find the ALJ was correct as of this point, would he be able to apply for a later period of years? Well, Ken, it's an SSI-only claim, so he would only be awarded benefits the month after he applies. That would be his third application. You can see from the record that he did apply and was denied once, and the ALJ relied heavily upon the earlier ALJ's findings. It does appear from Linda Schmechel's evaluation in 2008 that he had significantly deteriorated from the Michael Villanueva evaluation that was in 2003 that found that Mr. Alcivar's presentation was inconsistent with allegations of a head injury. But by the time we get to Dr. Keith Murdoch in 2009, there is a level of consistency between Schmechel, Murdoch, and Taubenfeld that would suggest he's arrived at some place by 2009 that's pretty consistent. And I would argue beyond the plaintiff's ability to control the results of these tests. The ALJ relied heavily upon that. Clearly, Mr. Alcivar was able to control his responses, but he had three separate tests over a seven-year period, and they were all very consistent. Dr. Alward finds that he lacks the psychological sophistication to even recognize his own mental health conditions. I find that to be further supportive that this man did not have the capacity to control his outcome on these sophisticated psychometric testings over a seven-year period performed three separate times. All right, Counselor, you're over your time. Why don't we hear from Ms. Ansiger? You may proceed. Good afternoon. Can you hear me? Yes. Wonderful. Good afternoon. I'm Diana Ansiger, appearing on behalf of the Commissioner and asking the Court to affirm the ALJ's decision. I wanted to touch on a couple of points that Appellant raised in his opening argument. First, I wanted to mention that if you look at the ALJ's credibility analysis, excuse me, subjective symptom complaint analysis in this case, it is not simply listing the factors. It is quite extensive. The ALJ discusses the activities, the record, Appellant's own statements, and cites specific examples that undercut the allegation that Appellant has alleged here. I also want to point out that in this case the ALJ did impose a fairly restrictive RFC that did accommodate some of Appellant's limitations. In fact, at the ALJ's decision at 46 and 47, the ALJ mentions that the evidence does support some problems with concentration and interaction with others, and that some pain resulted in a decreased ability to concentrate or to lift weights and to perform some postural changes. So I just wanted to start with that, because the ALJ's subjective symptom analysis is quite extensive, and it also does give Appellant some restrictions in the RFC. And along those lines, I know you're familiar with the record, and I won't reiterate all the medical records, but just on the point of the activities, it was not simply driving. It was driving daily, playing pool with friends at a bar, managing a household, cooking complete meals, not simply macaroni and cheese, but burgers, chicken, and vegetables. How about, just to move to Dr. Taubenfeld, how about the ALJ's treatment there? Because I think that part of the ALJ's decision is certainly thinner than the parts you're discussing. Yes, I would be happy to talk about that. So Dr. Taubenfeld did assess a number of significant limitations, and he did perform a variety of tests. Some of those tests were objective, highly sophisticated, as Mr. Hopla says, and others were based on subjective reports. So I do want to say as background, the first reason that the ALJ gave to reject Dr. Taubenfeld was his inconsistency with the objective medical record. And the reason that I brought up the credibility is because this decision as a whole, the credibility analysis, it's like a funnel. The credibility analysis has all the reasons, has quite a few examples, and the ALJ's interpretation of those examples and what they mean. Then we move to Dr. Alvord, where it's the same reasons but slightly less examples. Now, finally, we get to Dr. Taubenfeld, where it's the same reasons essentially, but there are fewer examples. For example, and I know a panelist pointed this out in his brief, Dr. Taubenfeld at the ALJ cited only one record to say that Dr. Taubenfeld's opinion was undercut by the objective medical record. But that opinion was 12F, which is also cited regularly in the credibility analysis with specific examples in the ALJ's interpretation of what those mean. So it's the commissioner's position that this level of articulation is sufficient, that ALJ should not have to rewrite every analysis of this evidence at each stage of the decision. How much does that turn, though, on the similarity between Dr. Taubenfeld and Dr. Alvord? Because it seems like the logic of that works if the closer they are to each other, the more similar their analyses and opinions, the more that logic holds. The more different the assessments and the nature of the evaluation, I have more questions as to whether it really works. Yeah, that's a good question. I think it works for objective evidence outside of their evaluations. Dr. Alvord and Dr. Taubenfeld did have different objective findings. And I think that the district board's analysis is interesting here, but I think what is actually the reason that this, if it is error, that it is harmless, is because the ALJ's decision as a whole, including the credibility analysis, explains why Dr. Taubenfeld's opinion is inconsistent with the objective medical evidence. How does that? I mean, some of Dr. Taubenfeld's opinion is based on an assessment of Mr. Josevar, but some of it, I mean, in terms of a discussion relying on things he said in their meeting, but some of it is more essentially diagnostic, you know, a psychometric evaluation. How strong is this argument when you start to look at some of the more truly testing components of Dr. Taubenfeld's opinion? I think it's a strong argument, and here's why. There are two components to Dr. Taubenfeld's report. There's intellectual functioning, and then there's social and emotional functioning. And you can see, first of all, many of the intellectual functioning issues are actually accommodated in the RFC. For example, Dr. Taubenfeld said he had problems with work speed, and the testing on that was done for reading, writing, and math skills. Well, the ALJ's RFC has no writing, no math, and reading at fourth grade level or below. So some of that is actually accommodated. Now, when I talk about what is subjective reports, if you look at Dr. Taubenfeld's opinion, he has a section in which he details the tests he performed in order to assess emotional and social functioning. And that is a broad area. It is getting along with others. It is having stamina. It is being able to concentrate. Those conclusions were based on tests that they are subjective tests. They're not sophisticated tests. The first one is the MCM inventory, number three, which is a self-report true-false questionnaire. The other test is the Beck depression and anxiety screens, which are surveys of current subjective intensity. So it is accurate to say that some of these restrictions, and quite possibly all of the ones that exceed the ALJ's RFC, are based on plaintiff-appellant subjective reports. So if you didn't have the ALJ's discussion of Dr. Alvord, but all you had was a discussion of Mr. Hostevar's subjective symptoms and then the one paragraph we have on Dr. Taubenfeld, would you take the position that the ALJ's treatment of Dr. Taubenfeld's opinion was sufficient? I would. Now, I'd like to say… Can I just clarify your argument? Sure. Are you saying that when the ALJ refers to Exhibit B12F when discussing Dr. Taubenfeld, we should look to all the other discussions of Exhibit B12F in the report to show what it means? Yes. Appellant is arguing that it's insufficient to cite a 300-page record. But three pages before this, the ALJ is citing 12F, along with many other instances of normal memory, no anxiety, no depression, normal mood. He can recall his injuries. He can recall his medical history. It is entirely reasonable to ask this court to infer what the ALJ means by 12F by the previous instances of 12F that the ALJ has already relied on. Now… Oh, sorry. Go ahead. Go ahead. Of course, as I mentioned, the Commissioner does not think that there is any error in this ALJ decision. But I just want to reiterate that if there is an error, it is an articulation error. And under Marsh v. Colvin, this court can still affirm, because a fact-specific inquiry that is looking at the whole of this ALJ's decision, you can infer that the ALJ is applying the same reasons. If you find the ALJ did not apply specific enough reasons for Dr. Taubenfeld looking at the decision of the whole, it can be inferred what the ALJ meant. It's pretty clear. And I see I have less than two minutes left, so I just briefly want to address remedy, if I may. If the court disagrees with the Commissioner and decides there is error in this case, I do want to point out that the proper remedy for that is remand and not payment of benefits. And the reason I say that is because if you look at Dr. Taubenfeld's opinion, in addition to the fact that many of his limitations are arguably incorporated into the RFC already, such as memory issues, the reading issues, the writing, the math, that is already incorporated in the RFC. But beyond that, the other limitations he assesses, work speed, may have difficulty functioning, may have limited stamina, these are not concrete vocational limitations that either establish or don't establish disability. These would need further development. Indeed, if you look at Dr. Taubenfeld's opinion, many of the restrictions appear to contemplate that appellant would, in fact, need these restrictions for future jobs. So it really can't be said from Dr. Taubenfeld's opinion, even if it was fully credited, that Mr. Josevar would be disabled. In conclusion, I ask this court to affirm the ALJ's thorough discussion as a whole, and if not, if the court should find error, which we do not think it should, to remand for further proceedings and not for payment of benefits. Thank you. Thank you, counsel. Mr. Hubbell, you went over your time, but I'll give you another minute. I think you're on mute. Sorry, that took me a moment. Regarding the fraud question, I mean the credibility question, the ALJ relied heavily on the fact that this man had been investigated by the CDI. Now, I'm not sure why somebody's having been investigated without a conclusion he was committing fraud would undermine the judge's credibility finding. Regarding the reference to 12-F, I'm not saying that the court shouldn't infer from other discussions in 12-F that the judge made four pages earlier, but the judge's reliance on the four pages earlier is on PA's normal mental status exams during a routine visit on December 16th. And I don't think that these mental status exams, which are just brief snapshots of a patient's well-being, are sufficient and substantial evidence to overturn the psychometric testing performed by Dr. Taubenfeld. And I would like to say with regard to remand that when we do fully credit the pace, persistence, emotional stamina, attention, and concentration concerns of Dr. Taubenfeld, Mr. Hosovar is disabled. Should we administer further testing to see exactly how much off-task? Well, the further testing's there. We've got Keith Murdoch. We've got Linda Schmechel. We're fully invested in the demonstrating, proving, and all the results have been consistent. He's unable to persist throughout a full workday. I hope that happened within a minute. Thank you, Your Honor. Thank you very much, Counsel. So Hosovar versus the commissioner of Social Security is submitted.
judges: WARDLAW, BRESS, BUMATAY